UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,                      :

                    Plaintiff,                      :          09 Civ. 05454 (GBD) (DF)

          -against-                      :          **REPORT AND**
                                   **RECOMMENDATION**
BLACKOUT MEDIA CORPORATION,                              :
formerly known as FIRST CANADIAN AMERICAN
HOLDING CORPORATION,                                     :
and SANDY WINICK,

                 Defendants,                      :

------------------------------------------------------------------------X

**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

      In this case, plaintiff Securities and Exchange Commission (the "SEC") has asserted

claims for securities violations against defendants Blackout Media Corporation ("Blackout") and

Sandy Winick ("Winick") (collectively, "Defendants"). After Defendants failed to answer or

otherwise respond to the Complaint, the Clerk of the Court entered a default against Blackout on

January 15, 2010 (Dkt. 19-3), and against Winick on August 27, 2009 (Dkt. 15-2). On March 4,

2010, the SEC moved for a default judgment permanently enjoining Defendants from violating

the registration, reporting, and proxy provisions of the federal securities laws; ordering

Defendants to pay third-tier civil penalties; requiring Winick to disgorge unlawful gains and to

pay pre-judgment interest; ordering Blackout's subsidiaries to cancel all stock that Winick still

owned or controlled in each such subsidiary; and imposing a permanent penny stock bar against

Winick. (Plaintiff's Memorandum of Law in Support of Motion for Default Judgment Against

Defendants Blackout Media Corporation and Sandy Winick, dated March 4, 2010 (Dkt. 22) ("Sec. Mem."), at 2.)

On September 20, 2010, the Court granted a default judgment against Defendants (Dkt. 26), but referred the matter to me to report and recommend as to the appropriate extent of relief that should be awarded.  (*Id.*)  On October 15, 2010, I ordered the SEC to file and serve on Defendants Proposed Findings of Facts and Conclusions of Law concerning damages.  (Dkt. 27.) The SEC submitted Proposed Findings on November 10, 2010 (*see* Plaintiff's Proposed Findings of Fact and Conclusions of Law Concerning Remedies To Be Assessed Against Defendants Blackout Media and Sandy Winick, dated Nov. 10, 2010 ("Pl. Proposed Findings") (Dkt. 28)), and apparently served a copy on Winick (*see* Certificate of Service, dated Nov. 10, 2010 (Dkt. 28)), who, to date, has neither filed a response nor contacted the Court to request a hearing. After inquiry by my chambers, however, the SEC has conceded that it never made any effort to serve its Proposed Findings on Blackout.[1]

Given that the SEC has not served Blackout with its Proposed Findings, I recommend that no injunctive relief or monetary penalties be imposed against Blackout.  As to Winick, though, for the reasons that follow, I recommend that the Court (1) issue a permanent injunction enjoining him from violating, or aiding or abetting the violation of, the registration, reporting, and proxy provisions of the federal securities laws, (2) order him to disgorge $3.2 million in ill-gotten gains, and to pay pre-judgment interest based on the IRS rate, from December 11, 2007

---

[1] According to the SEC's counsel, Blackout has been dissolved.  Although the SEC had initially received permission from the Court to effect service of process on Blackout by means of publication (Dkt. 17), the SEC did not seek permission to serve its Proposed Findings on Blackout by any alternative means.  Rather, it seems that the SEC simply decided not to attempt to serve its Proposed Findings on Blackout by any means.

2

to the date of judgment; (3) impose third-tier civil penalties against him in the amount of $130,000; (4) order the cancellation of all stock that he owns or controls in any of Blackout's subsidiaries and any of their successors; and (5) impose a permanent penny stock bar against him.

## BACKGROUND[2]

In its Complaint in this action, the SEC claims that Blackout, which was known as First Canadian American Holding Corporation ("FCAH") when the alleged illegal conduct occurred,[3] and Winick committed violations of the registration, proxy, and reporting provisions of the federal securities law, including violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"); Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9, promulgated thereunder; and Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-l, 13a-11, and 13a-13, promulgated thereunder.  The SEC also claims that Winick committed violations of Section 13(d) of the Exchange Act, and Rule 13d-1, promulgated thereunder; and Section 16(a) of the Exchange Act, and Rule 13d-1, promulgated thereunder. (*See* Complaint, dated Jun. 12, 2009 (Dkt. 1) ("Compl.").)  In particular, the SEC alleges that Defendants engaged in a fraudulent scheme to spin off publicly traded shell companies without registering the distribution of stock in those companies.  (*Id*. at ¶ 2.)

---

[2] The facts set forth herein are primarily taken from the SEC's Complaint, the allegations of which are accepted as true as a result of Defendants' default.  (*See infra* at Discussion Section I.)

[3] Because Blackout was known as First Canadian American Holding Corporation ("FCAH") when the alleged illegal conduct occurred, the company will be referred to herein as FCAH where appropriate.

According to the SEC, in 2002, Winick became the president of Adatom.com (a shell company), acquired 83% of its stock, and, in 2003, changed the company's name to FCAH.  (*Id.* at ¶ 12.)  The SEC contends that, from 2002 through 2007, Winick was FCAH's sole officer, director, and employee, and, from 2002 through at least 2005, controlled 99% of FCAH's stock. (*Id.*)

The SEC claims that, from April 2002 to May 2004 (the "Spin-off Period"), FCAH and Winick planned and executed numerous spin-off transactions to create 59 wholly-owned subsidiaries (the "Subsidiaries")[4] through unregistered distributions of stock in the Subsidiaries to FCAH's shareholders (particularly Winick).  (*Id.* at ¶¶ 2-3.)  The SEC alleges that Winick gained control of 99.5% of the newly spun-off Subsidiaries' stock, by distributing restricted

---

[4] The SEC identifies the 59 Subsidiaries as follows:  Adatom.com (Oregon), Adirondack Springs Beverages Inc., AQ Corporation, Broadspot Wireless Inc., Broadspot World Wide Wireless Inc., Central Asia Development and Construction Co. Ltd., Deep Water Investment Inc., Dtec Security Inc., Energy Concepts Inc., Equity Retirement Savings Distributors Inc., Farm Fresh Food Processors Inc., Findent Engineering Security Ltd., First Canadian American Credit Services Ltd., First Canadian American Financial Services Inc., First Canadian American Investment Ltd., First Canadian American Trust Company, First Caribbean Mining Development Inc., First Eastern Energy Development Inc., First European American Credit Ltd., First Mediterranean Gold Resources Inc., First Pioneer Maintenance & Supplies Inc., First Public Securities Transfer Corporation, First Western Environmental Protection Inc., Flugal Financial And Marketing Services Inc.; Flugal Financial Services, Ltd.; Form 59 Furniture Design Inc.; Form 59, Inc.; Fossil Graphics Inc.; Freshtech Food Processors, Ltd.; Future Quest Inc.; Golden Quest Ltd.; Goodies Galore Packaging Inc.; IBA Ltd. (Belize IDC); Josanden International Resources Inc.; Microgenix Canada Inc.; Microgenix Filtration Systems Inc.; Micro Genix Manufacturing Inc.; Naturally Niagara Beverage Corp.; New Wave Windmills Inc.; Pearl Asian Mining Industries Inc.; Second Bavarian Mining and Engineering Services Inc.; Second Colonial Mining and Engineering Services Inc.; Second Mongolian Mining Security Services Inc.; Security Innovations Systems Inc.; Security Plus Inc.; Seville Investment Funds Corporation; Sparrowtech Multimedia Inc.; Sweet Selections Ltd.; The Berkshire Collection Inc.; The Feinstein Report, Inc.; The Goldberg Report Ltd.; The Heritage Collection Inc.; Universal Beverage Inc.; Warlock Holdings Inc.; Wi-Fi Wireless Ltd.; World Assets Group Inc.; Xcelarator Interactive Inc.; Xcelarator Marketing Inc.; and  Xcelarator Studios Inc.  (*See id.*, Ex. 1 (providing a list of all 59 Subsidiaries and, *inter alia,* the original name of each of the Subsidiaries, the trading symbol for the stock of each of the Subsidiaries, and the trading market in which the stock of each of the Subsidiaries was traded).)

stock of the Subsidiaries to himself, and unrestricted stock of the Subsidiaries to his wife, four of his friends, and entities that he controlled.  (*Id*. at ¶ 17.)  The SEC contends that none of the 59 Subsidiaries filed the required Securities Act registration statement in connection with these spin-off transactions.  (*Id*. at ¶ 15.)

According to the SEC, no financial information about FCAH or any of the Subsidiaries was publicly available during the Spin-off Period.  (*Id*. at ¶ 15.)  The SEC contends that, during this time period, Winick – FCAH's sole officer, director, and employee – had a duty to ensure that FCAH filed annual reports on Form l0-K and quarterly reports on Form 10-Q.  (*Id*. at ¶ 38.)  FCAH allegedly filed no such reports during the Spin-off Period.  The SEC claims that, although FCAH filed current reports on Form 8-K (all of which were prepared, filed, and signed by Winick), these reports failed to disclose Winick's beneficial ownership of 99.5% of FCAH's stock, Winick's use of spin-off transactions to obtain control over 99.5% of the Subsidiaries' stock, or any meaningful information regarding FCAH's finances or that of any Subsidiary.  (*Id*. at ¶¶ 37-38.)

The SEC claims that, beginning in May 2003, Winick, on behalf of FCAH, filed a number of proxy statements on Schedule 14A, purportedly seeking shareholder approval of the spin-off transactions.  (*Id*. at ¶¶ 40, 42.)  Each of these filings included a letter to FCAH's shareholders from FCAH's chairman of the board, Winick, stating that the spin-off transaction was approved by the board of directors, announcing the date of a shareholder meeting to approve the spin-off transaction, and soliciting a proxy to vote at the meeting.  (*Id*. at ¶ 40.)  Winick allegedly appointed himself the proxy for these solicitations.  (*Id*.)  The SEC alleges that, during the Spin-off Period, Winick was actually the sole director of FCAH (so that there could not have been "board" approval), and that the address identified in the letter as the location for the

5

shareholder meetings was actually a UPS mailbox.  (*Id.*)  According to the SEC, the proxy statements themselves contained no financial information about FCAH or any Subsidiary, contained misleading information regarding the beneficial owners of FCAH and the Subsidiaries, and, in some cases, contained false information regarding the identities of the officers and directors of the Subsidiaries.  (*Id.* at ¶ 41.)

According to the SEC, the spin-off transactions had no legitimate business purpose whatsoever.  (*Id.* at ¶ 3.)  The Subsidiaries were typically "shell companies with no assets or business operations before the spinoff."  (*Id.*)  The SEC claims that Winick used the spin-off transactions to amass an inventory of shell companies to take to market.  (*Id.* at ¶ 18.)  The SEC alleges that Winick traded in the stock of some Subsidiaries to create the illusion that investors were actively trading in the stock of these companies.  (*Id.* at ¶ 20.)  According to the SEC, Winick would typically sell controlling interests in the Subsidiaries by executing a "change of control transaction in which a Subsidiary was combined with a private company through a reverse merger."  (*Id.* at ¶ 19.)  The SEC contends that buyers, in exchange for receiving Winick's controlling interest in the Subsidiary, typically paid Winick cash in the amount of $50,000 to $100,000, or gave him stock in the post-merger company, or paid him in both cash and stock.  (*Id.*)

The SEC claims that FCAH's stock and the Subsidiaries' stock are penny stocks.  (Pl. Proposed Findings, at ¶ 34 n. 4.)  Winick allegedly assisted some of the Subsidiaries in obtaining trading symbols from NASDAQ, as well as placement in the "pink sheets"[5] and over-the-counter

---

[5] A "pink sheet" is "[a] daily publication listing over-the-counter stocks, their market-makers, and their prices.  Printed on pink paper, pink sheets are published by the National Quotation Bureau, a private company. – Also termed National Daily Quotation Service."  *Black's Law Dictionary* (9th ed. 2009), pink sheet, *available at* Westlaw BLACKS.

("OTC") trading market.  (Compl., at ¶ 6.)  The SEC asserts that, in 2007, it suspended trading in the stocks of five Subsidiaries that allegedly engaged in spam campaigns lauding their stock's investment potential.  (*Id.* at 5 n.3.)  The SEC also states that it brought an action against one of the Subsidiaries, in the Northern District of California, alleging antifraud and registration violations.  The SEC contends that, as of June 12, 2009, the date of the Complaint, 12 of the Subsidiaries were quoted on either the OTC Bulletin Board or the pink sheets, and 37 of the Subsidiaries were traded on the OTC trading market.  (*Id.* at ¶ 20.)

According to the SEC, in 2006, Winick changed FCAH's name to Blackout.  (*Id.* at ¶ 12.)  The SEC claims that Blackout is still a publicly traded company quoted on the pink sheets.  (*See* Pl. Proposed Findings, at ¶ 21.)  The SEC contends that, although Winick allegedly announced his resignation from Blackout in November 2007, Winick may continue to control shares of the Subsidiaries' stock, either directly or indirectly.  (Declaration of Junling Ma in Support of Remedies to be Assessed Against Defendants Blackout Media Corporation and Sandy Winick, dated Nov. 15, 2010 (Dkt. 29) ("Ma Decl."), at ¶ 7.)

The SEC alleges that, from at least 2003 through 2007, Winick traded in the shares of the Subsidiaries, and profited by at least $3.2 million.  (*Id.* at ¶ 21.)

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

In conducting an inquest, the Court accepts as true all of the factual allegations of the Complaint, except those relating to damages.  *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).  A plaintiff must therefore substantiate a claim with evidence to prove the extent of damages.  *See Trehan v. Von Tarkanyi*, 63 B.R. 1001, 1008 n.12 (S.D.N.Y. 1986) (plaintiff must introduce evidence to prove damages suffered and the court will then determine whether

the relief flows from the facts (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974))).

Where a defaulting defendant has not made any responsive submission on a damages inquest, the

Court must assess whether the plaintiff has provided a sufficient basis for the Court to determine

damages.  *See Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111

(2d Cir. 1997) (noting that the Court "should take the necessary steps to establish damages with

reasonable certainty").

      Although a court may hold a hearing to assess the amount of damages (or disgorgement

and civil penalties) that should be awarded on a default, *see* Fed. R. Civ. P. 55(b)(2) (court may

conduct hearings on damages as necessary), the Second Circuit has consistently held that "[b]y

its terms, [Rule] 55(b)(2) leaves the decision of whether a hearing is necessary to the discretion

of the district court," *Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989);

*accord Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) (judges are given much

discretion to determine whether an inquest need be held); *Action S.A. v. Marc Rich & Co.*, 951

F.2d 504, 508 (2d Cir. 1991) (Fed. R. Civ. P. 55(b)(2) "allows but does not require . . . a

hearing").  Here, a hearing is unnecessary, as the documents before this Court provide a

"sufficient basis from which to evaluate the fairness" of the disgorgement and civil penalties

sought by the SEC against Winick, *Fustok v. ContiCommodity Servs. Inc.,* 873 F.2d 38, 40 (2d

Cir. 1989); *see also Marc Rich & Co.*, 951 F.2d at 508, and as Winick has submitted nothing in

response to the SEC's submissions, nor requested a hearing.

II.      **APPROPRIATE RELIEF TO BE AWARDED AGAINST WINICK**

    A.      **Permanent Injunction**

As an initial matter, the SEC seeks permanent injunctive relief against Winick, which is an appropriate request under the applicable securities laws.

Where a defendant has violated the Securities Act, Section 20 of that Act provides that, "upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 77t(b). "The Supreme Court has viewed injunctive relief as necessary in these actions for the basic protection of the investing public." *SEC v. Bonastia*, 614 F.2d 908, 913 (3d Cir.1980). Moreover, to obtain injunctive relief, the SEC need not show irreparable injury or the inadequacy of other remedies. *See SEC v. Managment Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) (stating that SEC suits for injunctions are "creatures of statute," and, therefore, not subject to the requirements of a private injunctive suit) (citations omitted). Rather, the SEC must show that there is a "'realistic likelihood of recurrence' of the violations." *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 876 (S.D.N.Y. 1997) (quoting *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978)).

Several factors are to be considered in determining the probability of future violations: "(1) the degree of scienter involved, (2) the isolated or recurring nature of the fraudulent activity, (3) the defendant's appreciation of his wrongdoing, and (4) the defendant's opportunities to commit future violations." *Softpoint*, 958 F. Supp. at 867. Where the defendant's misconduct involves "systematic wrongdoing" rather than an isolated incident, courts have found that there is a greater probability that the defendant will commit future violations of the securities laws. *SEC v. Sekhri*, No. 98 Civ. 2320 (RPP), 2002 WL 31100823, at *15 (S.D.N.Y. July 22, 2002).

Accepting as established the SEC's well-pleaded allegations as set forth above, Winick, together with Blackout, planned and executed a scheme to spin off the Subsidiaries – which were typically shell companies – and to create trading markets in the stocks of these companies without adhering to the registration, reporting, and proxy provisions of the federal securities laws.  At all relevant times, Winick was Blackout's sole officer, director, and employee.  He also controlled 99.5% of both Blackout's stock and the Subsidiaries' stock.  Among other misconduct, Winick knowingly (or, at the least, recklessly) filed reports with the SEC that concealed his beneficial ownership in Blackout and the Subsidiaries, and provided the public and the SEC with materially false and misleading information regarding the Subsidiaries' finances and business operations.  Winick, together with Blackout, systematically manipulated the spin-off mechanism to create the 59 Subsidiaries over a period of approximately two years.  From 2003 through 2007, Winick repeatedly traded in the shares of the Subsidiaries, and profited by at least $3.2 million.  As a result of Winick's repeated, material misrepresentations, thousands of investors who purchased stock in the Subsidiaries suffered substantial losses.  To date, Winick has failed to appear in this action, failed to recognize his wrongdoing, and failed to provide this Court with any assurances that he will not engage in further violations of the federal securities law.

Moreover, in the absence of a judicial prohibition, Winick may well commit future violations of the registration, reporting, and proxy provisions of the federal securities laws, given that he is likely to have maintained control of shares of the Subsidiaries' stock, either directly or indirectly.  In 2007, the SEC suspended trading in the stocks of five Subsidiaries that engaged in spam campaigns lauding their stock's investment potential.  In 2009, the SEC also brought an action against one of the Subsidiaries, alleging anti-fraud and registration violations.  Yet, as of

10

June 12, 2009, the date of the Complaint, 12 of the Subsidiaries were still quoted on either the

OTC Bulletin Board or the pink sheets, and 37 of the Subsidiaries were still being traded on the

OTC trading market.

Accordingly, I recommend that the Court issue a permanent injunction enjoining Winick

from violating:

<blockquote>

(1)      Sections 5(a) and 5(c) of the Securities Act,
15 U.S.C. §§ 77e(a) and 77e(c),

(2)      Sections 13(d), 14(a), and 16(a) of the Exchange Act,
15 U.S.C. §§ 78(m)(d), 78n(a), and 78p(a), and

(3)      Rules 13d-l, 14a-9, and 16a-3 promulgated thereunder,
*see* 17 C.F.R. §§ 240.13d-l, 240. 14a-9, and 240.16a-3; and

</blockquote>

and from aiding or abetting the violation of:

<blockquote>

(1)      Section 13(a) of the Exchange Act,
15 U.S.C. § 78m(a), and

(2)      Rules 12b-20, 13a-l, 13a-ll, and 13a-13 promulgated thereunder,
*see* 17 C.F.R. §§ 240.12b-20, 240.13a-l, 240.13a-ll, and 240.13a-13.

</blockquote>

### B.    <u>Disgorgement</u>

The SEC seeks disgorgement from Winick of $3.2 million, representing the approximate

amount of the ill-gotten gains he received through his involvement in the spin-off scheme.

(Dkt. 27; Pl. Proposed Findings, at ¶ 14.)  Based on the supporting documentation supplied by

the SEC, this approximation appears reasonable and should be awarded.

Disgorgement is an equitable remedy for violations of the federal securities laws, aimed

at "forcing a defendant to give up the amount by which he was unjustly enriched."  *SEC v. Tome*,

833 F.2d 1086, 1096 (2d Cir. 1987).  The Court has broad discretion in calculating the amount to

be disgorged.  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996).

Although the disgorged amount must be "causally connected to the violation," *id.* at 1475, the SEC "is not required to trace every dollar of proceeds" or "to identify misappropriated monies which have been commingled." *SEC v. Anticevic*, No. 05 Civ. 6991(KMW), 2010 WL 3239421, at *5 (S.D.N.Y. Aug. 16, 2010) (internal quotation omitted). After the SEC makes a showing of a disgorgement figure, the burden shifts to the defendant to demonstrate that the requested amount is not a reasonable approximation. *Id.* The court may also award pre-judgment interest on the amount awarded as disgorgement, in order to deprive the defendant of the time-value of the money. *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998). In SEC injunctive actions, pre-judgment interest should be calculated by applying the Internal Revenue Service tax underpayment rate (the "IRS rate"), as set forth in 26 U.S.C. § 6621(a)(2). *See First Jersey Secs.*, 101 F.3d at 1476-77.

In support of the requested disgorgement of funds from Winick, the SEC has submitted a declaration under penalty of perjury of Junling Ma ("Ma"), a staff attorney for the SEC's Los Angeles Regional Office, setting forth, in detail, the SEC's calculation of Winick's ill-gotten gains and providing documents underlying that calculation. (*See* Ma Decl., at ¶¶ 4-5.) Ma obtained and examined brokerage account statements of Winick-owned accounts; of a Winick-controlled account that was opened in the name of his wife, Jodi Winick; and of accounts opened in the names of six entities that Winick controlled: First European American Credit Ltd., First European American Trust, First European American Underwriters Ltd., Broadspot Wireless, Adatom.com, and The International Monetary Reserve. (*Id*. at ¶ 4.) Relying upon the information contained in these brokerage account statements, the SEC calculated, for each Subsidiary in which Winick traded, the net sales proceeds for each trade, and concluded that Winick's ill-gotten gains from the spin-off scheme totaled $3,214,595. (*See id.* at ¶¶ 4-5 (relying

12

on Ex. B, attached spreadsheet summarizing account statements).)[6]

Although the $3.2 million requested disgorgement amount does not precisely reflect the amounts totaled by Ma (or by the Court), "'[d]isgorgement need only be a reasonable approximation of profits causally connected to the violation.'" *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) (citation omitted)). Moreover, "any 'risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty,'" *id.* at 140 (quoting *First City Fin. Corp.*, 890 F.2d at 1232), and, here, Winick has said nothing regarding the SEC's approximation. Accordingly, as the SEC has shown $3.2 million to be a reasonable approximation of Winick's ill-gotten gains, I recommend that the SEC be awarded disgorgement from Winick of that amount, plus pre-judgment interest, based on the IRS rate, from December 11, 2007 to the date of judgment.

## C.      Cancellation of Stock

The SEC seeks the cancellation of Winick's stock in the Subsidiaries and any of their successors, a request that should also be granted, in this case.

"In any action or proceeding brought or instituted by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Some courts have used this power to cancel stock held by defendants who have repeatedly violated federal security laws or committed egregious violations of the federal securities laws. *See e.g.,*

---

[6] Relying on the documents provided by the SEC (Ma Decl., at ¶¶ 4-5, and Ex. B (attached spreadsheet summarizing account statements)), this Court has independently calculated Winick's ill-gotten gains as $3,219,082, an amount slightly higher than the $3,214,595 calculated by Ma. This discrepancy does not affect the reasonableness of SEC's $3.2 million approximation.

*SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2d Cir. 1971) (stating that "the district court had the power to order the cancellation of [defendant's stock] option so as to effect the purposes of the Act," although acknowledging that it should not have instructed the district court to apply this remedy before the court had determined whether defendant violated Rule 10b-5, or before the parties had been given an opportunity to address the appropriateness of the remedy for a Rule 10b-5 violation); *S.E.C. v. Save The World Air Inc.*, No. 01 Civ. 11586 (GBD), 2005 WL 3077514, at *20 (S.D.N.Y. Nov. 15, 2005) (ordering the company to cancel any issued and outstanding shares of stock held by defendant, the company's former board chairman and chief executive officer).

Given the seriousness and repeated nature of the securities violations alleged to have been committed by Winick; the fact that Winick's default establishes the underlying facts, as pleaded; and the failure of Winick to respond to the SEC's arguments regarding the propriety of stock cancellation as a remedy, despite having had an opportunity to submit argument on this subject; I recommend that each of the Subsidiaries be ordered to cancel any stock that Winick still owns or controls.[7]

---

[7] According to the SEC, as of the date of the Complaint, at least 42 of the Subsidiaries had undergone changes of control, and, consequently, assumed new names. (*See* Compl., Ex. 1 (providing a chronological history, as of the date of the Complaint, of the Subsidiaries' changes of control).) Given the passage of time since the filing of the Complaint, it is likely that at least some of the Subsidiaries have now undergone further changes of control, with further name changes. Accordingly, if the Court orders the cancellation of any stock that Winick owns or controls in the Subsidiaries, any such order should be framed so as to apply to the original 59 Subsidiaries (as identified in n.4, *supra*), and their successors.

### D.     Civil Penalties

The SEC seeks an award of civil penalties against Winick, for his involvement in the spin-off scheme.  Once again, for the reasons discussed herein, the requested relief should be granted.

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act permit a court to impose, upon a proper showing, a civil penalty that falls under one of three "tiers," the third tier being for the most serious violations.  To determine whether to impose a civil penalty and the amount of any penalty, the Court looks to a number of factors, including:  "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition."  *SEC v. Aragon Capital Mgmt., LLC*, 672 F. Supp. 2d 421, 447 (S.D.N.Y.2009) (quoting *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (citation omitted)). Third-tier penalties are appropriate where a court finds both that the defendant's actions involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and that the violations "resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 78u(d)(3)(B)(iii).

The SEC specifically requests the imposition of third-tier penalties civil penalties against Winick in the amount of $130,000.  (Pl. Proposed Findings, at ¶ 33.)  As the SEC explains, for violations of the securities laws committed during the time period at issue here (2003 through 2007), the maximum third-tier penalty against an individual defendant should not exceed $130,000 per violation.  (*See* Pl. Proposed Findings, at ¶ 33 n.3 (citing 17 C.F.R. § 201.1003 &

Table III (providing for inflation-based adjustment to the statutory maximum amount of civil penalties under the Securities Act and the Exchange Act)).)

Accepting as established the SEC's factual allegations, this Court finds that the relevant factors weigh heavily in favor of imposing third-tier civil penalties against Winick.  First, Winick committed egregious violations of the federal securities laws.  Among other misconduct, Winick, together with Blackout, executed numerous spin-off transactions to create the 59 Subsidiaries, which were shell companies with no assets or business operations; provided the public and the SEC with materially false and misleading information regarding the Subsidiaries' finances and business operations; concealed his beneficial ownership in the Subsidiaries, and sold controlling interests in the Subsidiaries to investors.  Second, Winick engaged in this misconduct with a high degree of scienter.  As Blackout's sole officer, director, employee, and beneficial owner (during the Spin-off Period, Winick controlled 99.5% of Blackout's stock), Winick planned and executed each of the spin-off transactions.  He also knowingly (or, at the least, recklessly) prepared, signed, and filed documents with the SEC that contained materially false and misleading information regarding the Subsidiaries' finances, business operations, and beneficial owners.  Third, as a result of Winick's repeated material misrepresentations, thousands of investors who purchased stock in the Subsidiaries suffered substantial losses.  Fourth, over a period of approximately two years, Winick, together with Blackout, systematically manipulated the spin-off mechanism to create the 59 Subsidiaries.  From 2003 through at least 2007, Winick repeatedly traded in the shares of the Subsidiaries, and profited by at least $3.2 million.  Finally, despite having been served with the SEC's Proposed Findings, Winick has not come forward to show any basis, arising from his financial condition, for reducing the penalty against him.

16

For these reasons, I recommend that the Court impose third-tier penalties civil penalties against Winick in the amount of $130,000.

### E.     Penny Stock Bar

The SEC is also seeking the imposition of a penny stock bar against Winick, and this request, too, should be granted.

Section 20 of the Securities Act authorizes the district court to order a penny stock bar "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock." 15 U.S.C. § 77t(g).  The purported penny stock must have a value of less than five dollars at the time of the violation.  *S.E.C. v. China Energy Sav. Tech.*, Inc., No. 06–CV–6402 (ADS) (AKT), 2008 WL 6572372, at *10 (E.D.N.Y. Mar. 28, 2008).  A person who was participating in an offering of penny stock "includes any person engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock." 15 U.S.C. § 77t(g)(2). Pursuant to the statute, the "court may prohibit that person from participating in an offering of penny stock conditionally or unconditionally, and permanently or for such period of time as the court shall determine." 15 U.S.C. § 77t(g).

"The standard for imposing [a penny stock bar] mirrors that for imposing an officer-or-director bar." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007) (citations omitted); *SEC v. Becker*, No. 09 Civ. 5707 (SAS), 2010 WL 2710613, at *1 (S.D.N.Y. July 8, 2010) (citing *Universal Express*).  The following factors should be considered in determining whether the imposition of an officer-and-director bar (or a penny stock bar) is warranted:  "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the

fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *Patel*, 61 F.3d at 141 (stating "the district court properly took into account the six factors that it identified" in determining whether defendant was substantially unfit to serve as an officer or director of any public company and should therefore be permanently enjoined from holding such a position); *see also*, *e.g., SEC v. Jadidian*, No. 08 Civ. 8079 (PGG), 2011 WL 1327245, at *7 (S.D.N.Y. Mar. 31, 2011) (following *Patel*).

Accepting as established the SEC's allegations as set forth above, this Court finds that the imposition of a penny stock bar against Winick is warranted.  As a threshold matter, from 2002 through at least 2007, the stock of Blackout and the Subsidiaries qualified as "penny stocks" because they were equity securities bearing a price of less than five dollars.  During this time period, Winick planned and executed a spin-off scheme, in which he issued, traded, and induced and attempted to induce others to purchase shares of penny stock in the Subsidiaries. With regard to the factors relevant to whether a penny stock bar should be imposed, the Court first notes that, in furtherance of his scheme, Winick egregiously violated the registration, reporting, and proxy provisions of the federal securities laws.  Second, Winick is a repeat offender, given that, from April 2002 to May 2004, he executed numerous spin-off transactions to create the 59 Subsidiaries, and that, from 2003 through at least 2007, he repeatedly traded in the stock of these companies.  Third, during the Spin-off Period, Winick controlled 99.5% of Blackout's stock, and, from 2002 through 2007, Winick was Blackout's sole officer, director, and employee.  Fourth, Winick's misconduct involved a high degree of scienter, as Winick knowingly issued, traded, induced and attempted to induce the purchase of shares of stock in the Subsidiaries, which he had reason to know were typically shell companies with no assets or

business operations.  Furthermore, among other misconduct, Winick knowingly (or, at the least, recklessly) provided the public and the SEC with materially false and misleading information regarding the Subsidiaries' finances and business operations, concealed his beneficial ownership in both Blackout and the Subsidiaries from the public and the SEC, and failed to file the requisite Registration statements relating to the spin-off transactions that created the Subsidiaries.  Fifth, Winick had an enormous economic stake in the spin-off scheme; by trading in the shares of the Subsidiaries, Winick has been shown to have profited by at least $3.2 million.  Sixth, Winick's conduct has evinced a clear disregard of the law, even in the face of SEC action, suggesting a high likelihood that he will continue to engage in such misconduct in the future.  In this regard, it should also be noted that, according to the SEC, 49 of the Subsidiaries – of which Winick may continue to control shares of stock – were still being quoted on either the OTC Bulletin Board or the  "pink sheets," or traded on the OTC trading market, as of the date the SEC's Complaint was filed in this case.

Accordingly, I recommend the imposition of a permanent penny stock bar against Winick.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the Court impose no injunction or monetary penalties against Blackout.  As to Winick, I recommend that the Court's judgment reflect the following:

(1)     entry of a permanent injunction enjoining him from violating, or from aiding or abetting the violation of, the registration, reporting, and proxy provisions of the federal securities laws (*see supra* at 11);

(2)     disgorgement of his ill-gotten gains in the amount of $3,200,000, plus pre-judgment interest, based on the IRS rate (as set out in 26 U.S.C. § 6621(a)(2)), from December 11, 2007 to the date of judgment;

(3)     imposition of third-tier civil penalties against him in the amount of
        $130,000;

(4)     cancellation of all stock Winick owns or controls in any of the
        Subsidiaries and any of their successors (*see supra* at 4 n.3 (listing the
        names of all 59 Subsidiaries)); and

(5)     imposition of a permanent penny stock bar against him.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

George B. Daniels, United States Courthouse, 500 Pearl Street, Room 630, New York,

New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl

Street, Room 525, New York, New York, 10007.  Any requests for an extension of time for

filing objections must be directed to Judge Daniels.  FAILURE TO FILE OBJECTIONS

WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND

WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985);

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*,

968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988);

*McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        May 15, 2012

                              Respectfully submitted,


                              DEBRA FREEMAN
                              United States Magistrate Judge

20

Copies to:

Hon. George B. Daniels, U.S.D.J.

Robert B. Blackburn, Esq.
Securities and Exchange Commission
3 World Financial Center
Room 4300
New York, NY 10281

John M. McCoy, Esq.
Junling Ma, Esq.
Securities and Exchange Commission
5670 Wilshire Boulevard,
11th Floor
Los Angeles, CA 90036

21